**Dewey WILSON, d/b/a Mini Bus Service, Plaintiff-Appellant,**

v.

**CITY OF ST. ROBERT, Missouri, a Municipal Corporation, Ray Adams, Mayor, Tyce Smith, City Counselor, and Tom Julian, Chief of Police, Defendants-Respondents.**

No. 14018.

Missouri Court of Appeals,
Southern District,
Division Two.

June 17, 1986.

Motion for Rehearing or Transfer
Denied July 7, 1986.

Application to Transfer Denied
Sept. 16, 1986.

Scott R. Traylor, Raymond A. Morwood, Springfield, for plaintiff-appellant.

Tyce S. Smith, Waynesville, for defendants-respondents.

HOGAN, Presiding Judge.

Plaintiff Dewey Wilson brought this action against the City of St. Robert, a city of the fourth class, and certain of its elected and appointed officers as such, seeking to enjoin the application and enforcement of Ordinance No. 211 of the City of St. Robert against the plaintiff on the general ground that plaintiff was doing business as a common carrier of passengers operating under a certificate of convenience and necessity issued by the Public Service Commission. A temporary injunction—or what we regard as such—was issued. Thereafter a hearing was held, evidence was received, and the trial court dissolved its temporary order. The plaintiff now appeals.

Mo.R.Civ.P. 92[1] carefully distinguishes between a "preliminary injunction" and a "restraining order." As noted, the initial order issued in this case appears to be a temporary injunction. The order dissolving that injunction is therefore final and appealable. *Niemann v. Carps, Inc.*, 541 S.W.2d 712, 714[1] (Mo.App.1976); *Perseverance Common School District No. 90 v. Honey*, 367 S.W.2d 243, 246[1] (Mo.App. 1963). The record filed is minimal to the point of being nonexistent, but from the pleadings filed we are able to ascertain that the plaintiff's "mini-buses"—those involved in this case—are 9–passenger station wagons.[2] As the merits of the appeal may be resolved upon the meager record by resort to well-established principles of law, we undertake to dispose of the cause finally upon its merits. Mo.R.Civ.P. 84.14; *Dickey Co., Inc. v. Kanan*, 486 S.W.2d 33, 36[1] (Mo.App.1972).

Plaintiff Wilson operated vehicles as passenger carriers between "the gate at Fort Leonard Wood" to the cities of St. Robert and Waynesville, and "back and forth." The vehicles are equipped with "two-way radio systems." On redirect examination plaintiff again testified that the "main purpose" of his business was "to transport people from Fort Leonard Wood to Waynesville and St. Robert, and from Waynesville and St. Robert to Fort Leonard Wood." It is conceded that plaintiff's vehicles sometimes pick up and discharge

---

1. References to statutes and rules are to RSMo 1978 and to Missouri Rules of Court (15th ed. 1984), except where otherwise noted.

2. There is some *suggestion* in the record that plaintiff's "mini-buses" may be 9– or 12–passenger vehicles of the order commonly called "vans." If that suggestion is a fact, our ruling applies to those vehicles as well.

passengers within the City of St. Robert. They wait in line with regular taxicabs in front of motels and at other regular stopping places.

Plaintiff was operating under a Certificate of Convenience and Necessity issued by the Public Service Commission on March 16, 1984. This certificate grants authority to the plaintiff to operate as a common carrier as follows:

"INTRASTATE:

*Irregular:* Transportation of passengers in nine-passenger limousine service between Fort Leonard Wood, Missouri and Waynesville, Missouri, on a call-and-demand, non-scheduled basis. Effective 4/24/80

Transportation of passengers (excluding railroad crew members) and their baggage in vehicles designed to carry not more than twelve (12) passengers between points in Pulaski County, Missouri, on the one hand, and, on the other, all points in Missouri, irrespective of the location of such points on the route or routes of regular route common carriers where through or joint service has been authorized or established. Effective 3/15/84"

The ordinance which the respondent city seeks and intends to enforce against the plaintiff was enacted January 5, 1981. It is styled "AN ORDINANCE TO REGULATE AND LICENSE THE TAXICAB BUSINESS, TAXICABS AND TAXICAB DRIVERS AND TO IMPOSE A LICENSE TAX THEREON; PROVIDING PENALTIES FOR VIOLATIONS...." The ordinance has several sections which are germane to this appeal. Section 2(B) of the ordinance provides:

" 'Taxicab Business' shall mean the business of offering to the public the service of transportation of passengers on other than fixed routes for a charge or fee."

Section 2(C) of the ordinance provides that:

" 'Taxicab' shall mean a motor vehicle used in a taxicab business."

Section 3 of the ordinance provides:

"No person shall engage in, operate or conduct a Taxicab Business within the City without having a current license therefor as provided by the terms of this Ordinance."

Section 4 of the ordinance further provides that:

"No person shall operate a taxicab within the City without having a current license therefor as provided by the terms of this Ordinance; provided, however, that this Ordinance shall not prohibit a person from driving a taxicab through the City *without stopping in the City.*" (Our emphasis.)

The ordinance also provides an elaborate licensure provision and generally restricts the operation of taxicabs in such manner as to protect the public safety. We do not propose to set it forth at length. We must however, set forth Section 25, which reads:

"The maximum number of passengers to be [carried] by a taxicab shall be the seating capacity of the vehicle as recommended by the manufacturer of said vehicle excluding the driver."

There was evidence that no attempt was made to apply or enforce the ordinance as to the plaintiff's operation until October of 1984. Then, as the city concedes in its brief, the Mayor and Board of Aldermen urged the enforcement of the ordinance against the plaintiff and someone advised the plaintiff of the city's intention. The two parties, without any indication of any spirit of mutual forbearance or cooperation, urge us to declare that the ordinance and the provisions of Chapter 390, RSMo 1978, are in direct conflict. We are also urged to declare the ordinance "void." We decline.

■ There are several rules of law which control this case. Most of those principles were stated in *City of Raytown v. Danforth,* 560 S.W.2d 846 (Mo.banc 1977). There, the court held:

" 'A municipal corporation such as [defendant] is a creature of the legislature, possessing only those powers expressly granted, or those necessarily or fairly

implied in or incidental to express grants, or those essential to the declared objects of the municipality. Any reasonable doubt as to whether a power has been delegated to a municipality is resolved in favor of nondelegation.' *Anderson v. City of Olivette,* 518 S.W.2d 34, 39 (Mo. 1975)."

*City of Raytown v. Danforth,* 560 S.W.2d at 848. The court went on to say:

"Statutes relating to the same subject must be read together and if possible in harmony, and provisions of one having special application to a particular subject will be deemed a qualification to another statute general in its terms. [Citations omitted.]"

Id. at 848. Moreover, the court suggested that when inconsistencies appear in statutes which are in pari materia, the later statute ordinarily prevails. Id. at 848. Further, there is a general rule of law that a municipality may not deny the reasonable use of its streets to public vehicles which are operated thereon under the authority of a certificate of public convenience and necessity issued by an authorized state commission. *Bay Cities Transit Co. v. City of*

*Los Angeles,* 16 Cal.2d 772, 108 P.2d 435, 438–39 (1940); *Adams v. Burke,* 308 Ky. 722, 215 S.W.2d 531 (1948); *Chicago Motor Coach Co. v. City of Chicago,* 337 Ill. 200, 169 N.E. 22, 66 A.L.R. 834 (1929); Note, 66 A.L.R. 847 (1929).

■ The appellant plaintiff in his first point contends that the trial court erred in dissolving the temporary injunction because regulation of the operation of plaintiff's vehicles by the PSC necessarily precluded regulation by the City of St. Robert. The respondent city answers that under the provisions of § 94.270, the Mayor and Board of Aldermen of the City of St. Robert were authorized to regulate the operation of taxicabs. Section 94.270, in one form or another, has been the law in this state since 1895. As counsel points out, § 94.270, set out marginally,[3] includes passenger carriers, but it also includes almost every other species of vocation. It is broad, general and inclusive.

Section 390.041.1, on the other hand, vests the PSC with authority "[t]o license, supervise and regulate every motor carrier in this state...." The term "motor carrier" as defined by § 390.020.9 includes both

---

3. "94.270. Power to license, tax and regulate certain businesses and occupations.—The mayor and board of aldermen shall have power and authority to regulate and to license and to levy and collect a license tax on auctioneers, druggists, hawkers, peddlers, banks, brokers, pawnbrokers, merchants of all kinds, grocers, confectioners, restaurants, butchers, taverns, hotels, public boardinghouses, billiard and pool tables and other tables, bowling alleys, lumber dealers, real estate agents, loan companies, loan agents, public buildings, public halls, opera houses, concerts, photographers, bill posters, artists, agents, porters, public lecturers, public meetings, circuses and shows, for parades and exhibitions, moving picture shows, horse or cattle dealers, patent right dealers, stockyards, inspectors, gaugers, mercantile agents, gas companies, insurance companies, insurance agents, express companies, and express agents, telegraph companies, light, power and water companies, telephone companies, manufacturing and other corporations or institutions, automobile agencies, and dealers, public garages, automobile repair shops or both combined, dealers in automobile accessories, gasoline filling stations, soft drink stands, ice cream stands, ice cream and soft drink stands combined, soda fountains, street railroad cars, omnibuses, drays, transfer and all

other vehicles, traveling and auction stores, plumbers, and all other business, trades and avocations whatsoever, and fix the rate of carriage of persons, drayage and cartage of property; and to license, tax, regulate and suppress ordinaries, money brokers, moneychangers, intelligence and employment offices and agencies, public masquerades, balls, street exhibitions, dance houses, fortune tellers, pistol galleries, corn doctors, private venereal hospitals, museums, menageries, equestrian performances, horoscopic views, telescopic views, lung testers, muscle developers, magnifying glasses, ten pin alleys, ball alleys, billiard.tables, pool tables and other tables, theatrical or other exhibitions, boxing and sparring exhibitions, shows and amusements, tippling houses, and sales of unclaimed goods by express companies or common carriers, auto wrecking shops and junk dealers; to license, tax and regulate hackmen, draymen, omnibus drivers, porters and all others pursuing like occupations, with or without vehicles, and to prescribe their compensation; and to regulate, license and restrain runners for steamboats, cars, and public houses; and to license ferries, and to regulate the same and the landing thereof within the limits of the city, and to license and tax auto liveries, auto drays and jitneys."

"common carriers" and "contract carriers."[4] The PSC has classified and considers plaintiff's operation as that of a "common carrier." The PSC is vested with exclusive authority to license and regulate all motor carriers other than those specifically excepted by statute. *State ex rel. Public Service Commission v. Blair*, 347 Mo. 220, 226, 146 S.W.2d 865, 871 (banc 1940). The legislation upon which the quoted provisions of Chapter 390 are based was enacted in 1931. The statute as amended to the 1971 revision includes "common carriers" but by the provisions of § 390.030.1 many species of passenger carriers are exempted from PSC regulation. Section 390.041.1 is nevertheless both more recent and more specific than § 94.270, and must control as an exception to § 94.270 unless the plaintiff's operation is exempt by the terms of § 390.030.

Section 390.030.1(3) in terms exempts taxicabs. However, the provisions of Chapter 390 must be read together, and § 390.020.17 defines the word "taxicab" to mean:

"[A]ny motor vehicle ... having a capacity of *not more than five passengers, exclusive of the driver and not operated on a regular route or between fixed termini.*" (Our emphasis.)

The plaintiff's operation—or at least the part of it with which we are concerned—does not fall within this exemption. Under the Commission's initial grant of authority, plaintiff was authorized to operate 9–passenger limousines between Fort Leonard Wood and Waynesville. He was operating between fixed termini, but he was not using 5–passenger vehicles. The grant of authority effective March 16, 1984, removed the fixed termini and granted plaintiff the authority to transport passengers and their baggage in 12–passenger vehicles between points in Pulaski County and all points in Missouri. The plaintiff's operation is not exempted from PSC regulation by § 390.020.17.

Upon the record before us, the only other exemption from PSC jurisdiction which might apply is that found in subd. 1, subparagraph (9) of § 390.030, which exempts (or excepts) as here material:

"The transportation of passengers or property for hire wholly within a municipality, or between contiguous municipalities, or within a commercial zone ... established by the Commission...."

There is no evidence in the record indicating that the plaintiff operated, or intended to operate his "mini-buses" *wholly* or *exclusively* within the boundaries of St. Robert. He does stop in St. Robert, but the Commission's regulation, 4 CSR 240–110.-040(6), with exceptions not applicable here, requires that:

"... no driver or operator of any motor vehicle used in the transportation of passengers in common carrier operations shall refuse to carry any person offering himself at any regular stopping place for carriage who tenders the regular fare to any regular stopping place on the route of said vehicle, or between the terminals thereof, if under the certificate for such route said carrier is allowed to carry passengers to such point, unless at the time of such offer said vehicle is loaded to capacity...."

Further, there is no evidence that the area served is within "contiguous municipalities" or that the Commission has established a "commercial zone." This exemption would apply only if plaintiff's operation were confined to the limits of a municipality, contiguous municipalities or a commercial zone established by the Commission. The plaintiff does stop at the same place as taxicabs which are subject to regulation by the City of St. Robert. Neverthe-

---

4. These statutes were amended after the 1978 general revision was published and before the control of public transportation was transferred to the Division of Transportation by Laws of Mo. 1985, p. 979, now codified as § 622.015, RSMo Supp.1985. Our inspection of the regulations adopted by the Division of Transportation concerning carriers indicates that initially, the Division of Transportation has adopted the PSC's regulation in toto. We conclude that neither the amendments to Chapter 390 nor the transfer of function has any substantive effect on this controversy or our opinion.

less, upon the general principles stated, we are of the opinion that the defendant city has no right to refuse plaintiff's vehicles the reasonable use of the city streets; it may not prohibit the plaintiff from stopping at a place where passengers are usually boarded by other carriers. As we have noted, a municipality may not deny the reasonable use of its streets to the holder of a Certificate of Convenience and Necessity issued by the PSC.

■ As we have said, the record is by no means as complete as we should have liked, but to reiterate, any reasonable doubt as to whether a power has been delegated to a municipality is resolved in favor of nondelegation. *City of Raytown v. Danforth*, 560 S.W.2d at 848; *Anderson v. City of Olivette*, 518 S.W.2d 34 (Mo.1975). We are in no doubt of the good faith of the Mayor and Board of Aldermen in enacting Ordinance No. 211; public transportation of passengers for hire involves the public health and safety. However and contrary to the view expressed by the trial court, there is no need for *two sets of regulations* particularly when the General Assembly appears to have intended the Commission's authority to be paramount to that of the City of St. Robert.

Wherefore, the judgment of the trial court is reversed. The cause is remanded to the trial court; that court is ordered to enter an order permanently enjoining the City of St. Robert, its officers, agents and servants from applying or enforcing Ordinance No. 211 to plaintiff's "mini-bus" operation and further enjoining the enforcement of any penal provision of the said ordinance against plaintiff or any driver operating any such mini-bus qualified under the licensing statutes applicable to operation of vehicles in intrastate commerce. Copies of the said order will be served upon every officer, servant or agent of the City of St. Robert charged with the duty of or authorized to enforce the said ordinance.

PREWITT, C.J., and MAUS and CROW, JJ., concur.